# Richmond.

## GAINES V. COMMONWEALTH.

### January 28th, 1892.

1. CRIMINAL PROCEEDINGS—*Witnesses for Commonwealth.*—The prosecutor is not bound to call every witness present at the transaction which is the subject of the indictment. *Hill's Case, ante* p. 633.

2. IDEM—*Trespasser—Force to expel.*—In trial of an indictment for murder, after the court had given for the commonwealth, without objection, the instruction following: "If the jury believe from the evidence that prisoner went to the store of deceased for the purpose of killing him, and was there abusive of him, and that deceased ordered him out and he refused to go, whereupon deceased, in order to compel him to go, used only the necessary force against prisoner, who thereupon fatally shot deceased, the conduct of the prisoner made him a trespasser; and the fact that deceased, thus provoked by prisoner, did use such force, did not justify or excuse prisoner in killing him, as it was prisoner's duty to leave the store when so ordered by deceased, and he was bound to submit to such force as was necessary to make him go ; and if, while such force was being applied, he killed deceased with a deadly weapon, it was murder," prisoner moved the court to add the following : "But if the jury believe from the evidence that when prisoner recovering from the shock of the blow inflicted with the weight, he found deceased drawing a pistol from his pocket to shoot him, he had the right to defend himself in any way to preserve his life, or to prevent great bodily harm ";

HELD :

Refusal to give the addendum, no error.

3. IDEM—*Evidence certified—Section 3484—Case at bar.*—Upon the certificate of the evidence in the case here, the verdict of guilty of murder in the first degree should not be disturbed.

Error to judgment of circuit court of Essex county, rendered January 24th, 1891, affirming the judgment of county court of

said county, sentencing the plaintiff in error, George Gaines, to be hanged, in pursuance of the verdict of the jury found upon the trial of an indictment for the murder of H. Percy Carlton. Opinion states the case.

*Thomas Croxton, T. G. Jones* and *H. L. Newbill,* for plaintiff in error.

*Attorney-General R. Taylor Scott* and *Wm. R. Aylett,* for commonwealth.

FAUNTLEROY, J., delivered the opinion of the court.

In this case the *evidence* is certified, and not the facts proved, " because the evidence was conflicting." A jury of his peers has found the plaintiff in error, George Gaines, guilty of murder in the first degree, and this court is required by the statute (Code 1887, sec. 3484) to consider the refusal of the trial court (as set forth in the prisoners sixth bill of exceptions) to set aside the verdict upon the motion of the prisoner, because contrary to the evidence, as if the prisoner, George Gaines, had demurred to the commonwealth's evidence, and must reject all the evidence for the prisoner which is in conflict therewith.

Upon the trial, the commonwealth introduced an eye witness to the shooting, H. N. Dyke, who said : " I was at Percy Carlton's store, at the shooting, between eight and nine o'clock at night, on the 7th day of August, 1890, which store-house is in Essex county, Virginia, where the said Carlton was mortally wounded, and died September 21st, 1890, from said wound. Carlton slept in his store as his habitation. Julius Chamberlain and William Corbin were there first, and James Gresham and John Gaines came in together, before *George* came. George Gaines came in and asked John Gaines how long before his brother, Tom Gaines, would be here. When George Gaines got there, Percy Carlton was waiting on William Corbin.

After Percy got through waiting on William Corbin, he asked George Gaines back with him into the counting-room, and told him he wanted to see him, and Gaines said: 'Yes; I want to see you, too.' Carlton told him that he understood he wanted to see him; and George said, what he had to say he could say right here, and Carlton told him to go ahead. George said: 'I want to know about that note you wrote to my wife?' Carlton denied writing to his wife, and said, 'I will tell you all about the note. The boy Sam came to the well at the store and got a bucket of water, and came in and called for a cake; and he Carlton had been scribbling on some paper before the boy came in, and left it lying on the counter; and on the slip of paper was, 'Dear Miss: Come out to-night to see me after I close the store.' Carlton asked George if his wife did not say that was what was in the note, and George said, it was something like that. Carlton asked him if there was any name signed to the scrip of paper; and he, George, said, 'there was no name to it.' Carlton told him that was all he had to say about it, and told him, George, if he had anything to say about it, he could go ahead. George Gaines commenced abusing and cursing Percy. Percy said: 'Look here, George, I see that you came here to have a difficulty with me.' And then said, 'if he, George, came for that, he had better leave, as he, Percy, did not want any difficulty with him.' George Gaines said, 'he would not go anywhere.' Then Percy Carlton said, 'If he came for that he would have to go out,' and George said again that he would not go, and drew his pistol and ran it up in his face; and Percy, who had been all the time standing behind the counter (the right counter, entering the store), dropped down behind the counter, and George reached over the counter and shot him in the back. George still pointed over the counter as if to shoot him a second time, and then went out of the door. Percy reached over the counter and shot at him as he went out. While George and Percy were talking, I entered the store from the porch and told George to say no more, but

let it drop. Percy had done all he could to avoid a difficulty. Prisoner lives three or four hundred yards from the store. I saw pistol, but cannot describe it. Percy ordered George to leave the store two or three times, and George refused. When George drew a pistol, Percy dropped behind the counter on his hands and knees. George advanced, after he dropped behind the counter, and reached over and shot him in the back. I got off the counter and tried to prevent him shooting again, when George went out backwards waiving pistol in my face. Percy fired at George as he was going out of the door, and the ball must have gone out of the door, as we could find no mark inside the door. Percy's shot followed very quickly. I did not see Percy throw any weight. I was sitting on the counter that separated Percy and George when the first shot was fired, and saw everything that occurred, but did not see weight thrown. William Corbin and George Gaines had a private conversation, and I overheard William Corbin tell George Gaines that ' I don't blame you, I would do the same thing.' The two counters ran parallel to each other—making lobby in between them. George before he rushed and fired, was standing in lobby, about middle of same, and in front of Percy. Percy said, in conversation with George, that it was his store, and he had a right to write what he pleased. He, the witness, told George you ought to be satisfied—Percy has said and done all he can. Percy said, during the altercation, you believe the boy before me—but how is it about the time the boy came here to the store and spent your money in buying cakes, and if it had not been for Thomas Lewis Gaines and Lucius Parron, who were here, you would have thought I got your money. The prisoner said, 'Yes, Sam did lie that time,' but he believed him now. Percy did everything he could to avoid the difficulty. The prisoner fired after Percy had ordered him out several times. Percy said 'If you want a difficulty leave the store.' "

Thomas Parron, a witness for the commonwealth, testified that Percy Carlton was not of age when he was shot.

The ball entered Carlton's body, one and one-half inches under the lower part of the left shoulder blade, passed through the spinal column, and ranged down obliquely, between the seventh and eighth vertebræ, and was extracted from the right side of his body above the hip; and Carlton died from this wound September 21st, 1890. His *dying declaration*, duly taken and authenticated, was put in evidence by the commonwealth in these words: " On or about the 1st day of August, 1890, I had been scribbling on some paper lying on the counter, and sometime after that a boy, by the name of Sam, who lives at the house of George Gaines, came to the store and asked for some cakes, and, I suppose, he must have taken the piece of paper upon which I had been writing, and carried it to the house, as the wife of George Gaines, Mary, came to the store and seemed to be very angry, and asked me why I sent her that insulting note, and, at the same time, handed it to me. I took the paper and read it. I recognized that it was my handwriting, and read as follows: ' Dear Miss : Come around to see me after I close up.' There was no name signed to this paper, nor was it addressed to any one. I told her it was not intended for her or anyone else, and that I had never written her a line in my life, nor had I any intention of insulting her, and was sorry that she should have thought so. She then said she thought I did it intentionally. I then told her to leave the store, which she did. On the Monday following—4th of August—I left home to attend a camp-meeting in the Northern Neck. I returned on Thursday, the 7th of August, and was informed by the clerk at the store (Jack Dunn) that George Gaines had been at the store asking if I had gotten back; and on the night of the 7th of August, about eight o'clock, he (George Gaines) came into the store, and did not speak. At that time I was waiting on a customer, and after I got through I told him to come around in the counting-room, I wished to talk to him. He told me he would not go anywhere; that what he had to say to me he would say it where he was; and wanted to know what I had

written his wife. I explained the matter to him, as I had to her: that I had never written her a note, and intended no insult to her. He (George Gaines) then commenced abusing me; called me a low-life white man. I told him to leave the store; he replied that he would not. I told him he would have to get out. I then took up a two-pound weight near me, and threw it at him. He (George Gaines) immediately drew his pistol and advanced on me with it in his hand. I dropped down under the edge of the counter, and he fired the pistol, and the ball passed through my body. I fell on the floor, behind the counter, where I had been all the time. As soon as I recovered from the shock I drew my pistol from my pocket, pulled up by the counter, and fired at him as he was going out of the door. And I do further state that I make this statement believing that I have but a short time to live: and, in the fear of God, have stated nothing but the truth."

Before this dying declaration of the murdered man was admitted as evidence and read to the jury, the justice of the peace of Essex county, G. H. Dillard, who took and certified it from the lips of the dying man, testified that he was, when he made it, under the sense and impression of impending death and immediate dissolution, without hope of recovery, that he so declared to him before he made it, and also at the time of making it; that he was very weak, and that he had to wait on him to give him time to make it; that the Rev. Mr. Scott had a short time before prayed with him, and he expressed himself as pleased; that his mind was clear, and was under a moral and religious sense of accountability to God; and that, under these circumstances, he swore to and signed his mark, X, to the declaration, the 19th day of August, 1890.

Clarence Bohannon, a witness for the commonwealth, testified: " I saw prisoner Wednesday evening, August 6th, 1890 ; he asked for Percy Carlton—where he was; that he had important business with him, and said he meant to shoot him on sight; gave no reason for saying so. I was at the store fre-

quently between the time Percy was shot, including that night and the time of inquest, and the 21st September, time of inquest. I mentioned the matter to Colonel Farinholt on my way from John A. Carlton's house to the store, less than half mile on my way, in company with Farinholt to the inquest. I lived with John A. Carlton, father of deceased. I never mentioned what George said to anyone before that morning. George (Percy?) was a first-rate fellow; we were intimate. I did not mention what the prisoner said about shooting deceased, because I did not see him alone, and did not wish to alarm the ladies of the family by telling him in their presence, and had no other opportunity. I did not see the deceased from the time I saw him at dinner, Wednesday, until after he was shot."

Jack Dunn, a witness for the commonwealth, testified: "Was clerk for Carlton from 4th to 7th of August, 1890, while Carlton was at camp-meeting. The prisoner enquired Tuesday evening at the store for P. Carlton; and again Wednesday evening he came in the store and looked around and said nothing. Thursday morning, on his way to Shiloh, he came again and enquired for Carlton, and I told him I did not think he would be back before to-morrow. I informed Carlton of it."

There were several other witnesses for the commonwealth, but the substance and the point of their testimony are unimportant to this review.

The following four colored witnesses, who were present at the shooting of the deceased by the prisoner, and who had been summoned by the defence, were, on the motion of the prisoner (the commonwealth having declined to examine them), put upon the stand by the court and examined. Julius Chamberlain testified: "Was sitting in the store, and Geore Gaines came in, and said, ' Good morning.' Carlton said, ' George, I would like to see you in the counting-room.' George Gaines said, ' No; see me here!' Carlton never would tell what the note said. Finally George said, ' I would like to have some satisfaction '; and Percy said, ' Go out of here.' Carlton

finally ordered George out, and got up a weight and struck him. George staggered and shot at him. *Carlton had not drawn any pistol. George did try to shoot him again.* Don't know how Carlton fell. Carlton denied that he wrote the note to her. George asked him if the note did not say, 'Dear Mary, come to the store, and stay with me.' Did not see any lamps go out. Percy said that when the note was brought to the store it lay on the counter; that he could not talk with her; she was in a passion; she had better go out; that the boy, when he went out, must have picked up the note. George shot him where he stood—at the other counter; saw the weight strike the prisoner."

This witness denied that he had given an entirely different account of this transaction, shortly after the shooting, to Major William A. Saunders, J. C. Eubank, George Taylor, and J. W. Young, and he also denied that he had told these gentlemen—some in half an hour after the shooting and others the next day—that the prisoner came in, and abused Percy Carlton, and, when ordered to go out, drew his pistol and advanced on Carlton, and leaned over the counter, and shot him after he had dodged behind it. And witness denied that, after this statement, Major Saunders told him to stick to what he had said—that he was a first-rate commonwealth's witness.

Major Saunders was called by the commonwealth in rebuttal, and testified that he met Julius Chamberlain on Friday evening, after the shooting, at Colonel Farinholt's store, where he made the statement. George Gaines came into Mr. Carlton's store on night of the 7th of August, cursing and abusing Carlton, the deceased. As he came in he drew his pistol, advanced on Carlton, and Carlton took a weight off the counter, and threw it at him, and George Gaines reached over the counter, and shot him after he had dodged down; said he took a note of this statement, and told Chamberlain he would make a good witness for the commonwealth; stick to what you have said to me.

J. C. Eubank, a witness called by the commonwealth in rebuttal, testified that he heard Julius Chamberlain say to Major Saunders that the prisoner reached over the counter and shot Carlton.

The other three witnesses—John Gaines, a brother of the prisoner, William Corbin, and James Gresham—who were put upon the stand by the court, on the motion of the prisoner, testified to substantially the same particulars of the interview and shooting of the deceased, in the store, on the night of the 7th of August, 1890, by the prisoner, as detailed by the witness Chamberlain, except that they do not say—as Chamberlain does expressly—that " Carlton hadn't drawn any pistol. George did try to shoot him again."

The prisoner testified in his own behalf, and details the circumstances of the shooting.  So far as his statements are contradictory of or in conflict with the evidence for the appellee, we cannot consider it upon this review; and it would extend this opinion beyond all bounds to set it out at length.

Upon this evidence the jury found the prisoner guilty of murder in the first degree, and the trial court overruled the motion of the prisoner to set aside the verdict and to grant a new trial, on the ground that it was contrary to the evidence, which action of the county court was affirmed by the circuit court of Essex county.

We are of opinion that the evidence plainly and fully proves a case of deliberate murder—if not, indeed, a systematic assassination—of young Percy Carlton, in his own castle, by the prisoner, George Gaines, who, nursing his wrath from the 4th till the night of the 7th of August, and seeking for his victim in all that interval, deliberately went to his place of business and his habitation, armed for the purpose, and provoked and necessitated a conflict, by refusing to be satisfied with a full and ample explanation and apology for a supposed wrong, and obstinately and defiantly refusing to leave the house of an unprotected youth, whom he continued violently

to curse and abuse; and finally to rush upon and lean over the counter and shoot in the back, while he was crouching and retreating from him. The verdict is right, and the county and circuit courts of Essex did not err in refusing to set it aside.

There were various exceptions taken by the prisoner to the rulings of the trial court, as set forth in sundry bills of exceptions.

The first bill of exceptions assigns as error that the prisoner's counsel moved the court to direct the attorney for the commonwealth to call, *as his witnesses,* Julius Chamberlain, William Corbin, James Gresham and John Gaines, who were present at the scene of the shooting, and who were in attendance upon the court, having been summoned by the prisoner; which motion the court overruled.

These four witnesses were, however, called, and put upon the stand by the court, on the motion of the prisoner, who had the full benefit of their testimony, which went to the jury for all it was worth. The commonwealth's attorney declined to call them, and thus make them witnesses for the commonwealth, both because he deemed the evidence for the prosecution full enough without them and because one of them was prisoner's brother and another of them, if not an actual confederate, was heard to say to the prisoner, on the spot and instantly before the prisoner did the shooting, and responsive to what the prisoner said to him, "I don't blame you; I would do the same thing."

The prosecuting officer of the law was content to rest his case for the state upon the proof adduced; and the trial court, in its sound discretion, granted the request of the prisoner, and put the said four eye-witnesses of the shooting upon the stand, who testified in behalf of the prisoner.

Upon principle, authority and precedent it is the discretion of the prosecuting attorney for the state to determine who and what witnesses to examine for the state. *State* v. *Smallwood,* 75 N. C.; *State of West Va.* v. *Cain,* 20 W. Va. Reports; *Mor-*

*row* v. *State*, 57 Miss.; *Selph* v. *State of Florida*, 22 Florida Rep. The rule and the reason of procedure upon this point has been elaborated and settled for the courts of Virginia by the decision of this court in the case of *Lee Hill* v. *Commonwealth*, delivered a week ago by Lewis, P., *ante*, p. 633.

The second assignment of error, is the giving by the court of the following instruction, coupled with the refusal of the court to supplement the same by an addendum offered by the prisoner, viz: " If the jury believe from the evidence that the prisoner went to the store of the deceased for the purpose of killing him, and was abusive and denunciatory towards the deceased in his own store, and that deceased ordered him out and he refused to go, whereupon deceased, to compel him to go, used only the necessary force against the prisoner, who thereupon fatally shot deceased, the conduct of the prisoner made him a trespasser, and the fact that the deceased, thus provoked by the prisoner, did use such force, did not justify or excuse the prisoner in killing him, as it was the duty of the prisoner to leave the store when so ordered by the deceased, and he was bound to submit to such force as was necessary to make him go; and if, while such force was being applied, he killed the deceased with a deadly weapon, it was murder." To which the prisoner moved the court to give the following addition: " But if the jury believe from the evidence that when the prisoner recovered from the shock of the blow inflicted by the weight, he found the deceased drawing a pistol from his pocket to shoot him, he had a right to defend himself, in any way, to preserve his life, or to prevent great bodily harm." Which motion the court overruled, and properly refused to impair and emasculate the single and clear-cut proposition of the instruction which it had given, as to Carlton's *rights in his castle*, against a violent, menacing, and aggressive trespasser, and his right and power to expel him, by just so much and whatever force was made necessary by the contumacy, resistance, and refusal of the wrong-doer, by adding thereto an incongruous,

misleading, and artful qualification. But the proposition stated in this addendum is viciously at war with the law that "if the defendant (prisoner) in any way challenged the fight, and went to it armed, he cannot afterwards maintain that, in taking his assailant's life, he acted *in self-defence.*" 1 Wharton Crim. Law (9th Ed.), section 485, and cases there cited in notes.

"A man has not, as is properly said by *Breese,* *C. J.,* the right to provoke a quarrel, and take advantage of it to justify the homicide." (*Idem;* "*Vaiden's Case,*" 12 Gratt.; "*Dock's Case,*" 21 Gratt.)

"This right of self-defence does not imply a right of attacking; for, instead of attacking one another for injuries, past or impending, men need only have recourse to the proper tribunals of justice. Neither does it imply the right to take the life of an antagonist on every casual *rencontre;* for this would place human life too much at the mercy of those disposed to destroy it. * * * For which reason the law requires that the person who kills another in his own defence, should have retreated, as far as he conveniently or safely can, to avoid the violence of the assault; and that not fictitiously, or in order to watch his opportunity, or to gain breath, but from a real tenderness of shedding his brother's blood." (Davis' Crim. Law, 76, 77, 78.)

The foregoing principles of law and authorities cited are applicable to and dispose of the errors assigned as to the *fifth, sixth,* seventh, eighth, and *ninth* instructions, which were (with modificatians to the seventh and eighth) granted by the court. They simply state axioms of criminal jurisprudence strictly applicable to the evidence in the case, and they need not be extended at length in this opinion already too long.

Upon a careful review of the whole case—law and fact—we are concluded in the opinion that the plaintiff in error, George Gaines, with malice in his heart, and armed with a loaded pistol, having nursed his purpose and brooded over a supposed insult to his wife from the 4th till the night of 7th of August, 1890, entered, at 9 o'clock that night, the house of Percy Carl-

ton; persistently refused Carlton's ready, full, and earnest explanation, denial, and apology; defiantly and insolently forced a quarrel and a conflict; and drew from his pocket a pistol, and shot Carlton in the back, after he had fled and and sought shelter from him behind and under the counter of his own store-house; and then backed out from the house, brandishing his deadly weapon in the face of the witness Dyke, whose intervention had defeated and prevented his effort to shoot his murdered victim a second time.

There is no error in the judgments of the county and circuit courts of Essex county under review, and our judgment is to affirm them.

RICHARDSON, J., and HINTON, J., *dissented.*

JUDGMENT AFFIRMED.